IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARCUS L. MOSES,<br>12610 Carolina Meadow Lane<br>Clinton, MD 20735<br><br>   Plaintiff,<br><br>   v.<br><br>NEIGHBORHOOD REINVESTMENT<br>CORPORATION d/b/a NEIGHBORWORKS<br>AMERICA,<br>999 North Capitol Street NE, Suite 900<br>Washington, DC 20002<br><br>   Defendant. | **COMPLAINT**<br><br>Case No. 22-1813 |

## Introduction

1. Neighborhood Reinvestment Corporation (NRC) holds itself out as a community development financial intermediary that pursues its mission conscientiously. It receives annual appropriations from Congress to fund organizations that help low-income homeowners and boost homeownership in urban and rural areas throughout America. This means NRC must comply with federal laws that govern procurement and government contracting.

2. Soon after becoming NRC's senior vice president of procurement, Marcus L. Moses discovered that chief executive officer Marietta Rodriguez and other NRC higher-ups were committing numerous procurement and government contracting violations. They were creating forbidden conflicts of interest and circumventing the required bidding process by awarding large contracts directly to their friends. They were rushing those large sweetheart contracts through the procurement process by omitting and fudging documents required by law. They were extending large contracts and adding funding to the contracts by backdating them and circumventing the procurement process.

1

3. These egregious violations became so widespread—and they remain ongoing—that at least one anonymous employee's external whistleblowing made U.S. Senate Banking Committee Ranking Member Pat Toomey demand in January 2022 an investigation of NRC for chronic mismanagement and the inappropriate awarding of sole-source contracts. *See* Exhibit 1.

4. Moses, however, blew the whistle internally and lost his job as a result. He reported the violations to NRC's internal audit department between May 2021 and January 2022. The department's investigation team interviewed him about the violations on January 17, 2022. At the interview he told the team everything he knew about the violations. Three days later NRC fired him for bogus reasons.

5. Moses brings this suit against NRC under the False Claims Act (FCA) and DC common law because, among other things, NRC fired him in retaliation for reporting NRC's illegal misuse of federally appropriated funds to its internal audit department, requesting a formal investigation into NRC's illegal activity, and participating in the investigation.

6. He requests a trial by jury and seeks $1,000,000 for economic damages, compensatory damages, punitive damages, attorney's fees and costs, and all other suitable relief.

## Jurisdiction and Venue

7. This Court has subject matter jurisdiction over this suit under 28 U.S.C. § 1331, 28 U.S.C. § 1367, 31 U.S.C. § 3730, and 31 U.S.C. § 3732.

8. This Court has personal jurisdiction over NRC because it is a DC business organization and conducts significant business in the District of Columbia.

9. Venue is proper under 28 U.S.C. § 1391(b) because the events described in this Complaint occurred in the District of Columbia and NRC maintains its principal place of business there.

**Parties**

10. The plaintiff, Moses, is a resident and citizen of the United States. He holds a BA in business administration from Bowie State University, an MBA from the University of Maryland at College Park, and an MA in government contracts from the George Washington University.

11. The defendant, NRC, is a congressionally chartered nonprofit organization located in the District of Columbia.

12. Whenever this Complaint says that NRC committed an act or omission, it means that NRC or its employees, officers, directors, vice principals, or agents committed the act or omission; that the act or omission was committed with NRC's full authorization, ratification, or approval; or that the act or omission was committed within in the scope of employment of the employees, officers, directors, vice principals, or agents.

**Factual Background**

***Competition and integrity requirements for procurement and government contracting***

13. NRC receives annual appropriations from Congress.

14. NRC must use the appropriations to support a national network of more than 240 housing organizations engaged in community development.

15. So NRC must adhere to all legal requirements for competition and integrity in procurement and government contracting. The requirements are stated in the Antideficiency Act of 1884, the Competition in Contracting Act of 1984, the Procurement Integrity Act of 1988, the Bona Fide Needs Rule, and other related laws and accompanying regulations.

***Moses discovers ongoing procurement and government contracting violations at NRC.***

16. In September 2018, NRC hired Moses as its senior vice president of procurement.

17. Moses worked under the direct supervision of chief financial officer Kemba

Esmond between May 2021 and January 2022.

18. His duties included, without limitation, developing integrated acquisition strategies and processes for procurement supporting NRC's programs; leading a team of procurement staff; and collaborating with senior leaders and staff members of NRC's business units to seek commonsense solutions that meet business needs while maintaining the integrity of the procurement and government contracting process.

19. Moses performed his job duties in an exemplary manner and met all legitimate job expectations throughout his NRC tenure.

20. Between December 2019 and January 2022, Moses discovered procurement and government contracting violations occurring at NRC and reported them to several higher-ups in NRC's internal audit department, including (but not limited to) chief internal audit executive Frederick Udochi and senior vice president of internal audit Guy Meruvia.

***Moses reports the illegal extension and funding of a $1,000,000 contract.***

21. Around December 2019, general counsel Rutledge Simmons told Moses that a $1,000,000 contract awarded noncompetitively to Housing Partnership Network (HPN) under NRC's Compass program needed an extension because the contract was about to expire. Simmons also told him there was no formal contract to extend—the HPN contract was never reduced to writing and thus was not in NRC's system—because the HPN contract was facilitated outside the procurement process and without the procurement department's involvement.

22. Moses told Simmons that noncompetitively awarding a $1,000,000 contract outside the procurement process and without the procurement department's involvement violated NRC's established policy and was illegal.

23. Simmons responded by proposing that Moses create a written contract in NRC's system for HPN and backdate it to the date of NRC's original agreement with HPN to fix the

problems spotlighted by Moses.

24. Moses refused, explaining that carrying out Simmons's proposal would violate NRC's established policy and be illegal.

25. The next day Moses told Rebecca Bond, the chief financial officer at the time, about Simmons's proposal and why it was illegal and in violation of NRC's established policy. Moses also recommended that Simmons and chief operating officer Susan M. Ifill prepare a memorandum chronicling the HPN contract's checkered history; that the memorandum spell out the corrective actions to take moving forward (such as the requirement that all future actions on the HPN contract be processed through NRC's procurement department); that a written contract with the present date be created in NRC's system; and that the memorandum be attached to the written contract as supporting documentation for audit purposes.

26. Bond approved Moses's recommendations.

27. Simmons and Ifill, however, were displeased with Moses and his recommendations.

28. Shortly after the conversation with Bond, Moses reported the violations on the HPN contract to Udochi.

29. Two years later, around December 2021, Moses learned from a subordinate that Rodriguez and Ifill had violated various procurement and government contracting laws as well as NRC's established policy by renegotiating the HPN contract without involving NRC's procurement department. He also learned that Rodriguez and Ifill had been forcing employees in NRC's program department to add funds to the HPN contract without involving NRC's procurement department.

30. Moses then investigated the claims himself and determined that at least an additional $800,000 had been added to the HPN contract—without involving NRC's procurement department—between December 2019 and December 2021.

31. In January 2022, he reported those violations to NRC's internal audit

department, explained why they were illegal, and identified Rodriguez and Ifill as the higher-ups responsible for committing the violations.

### *Moses reports violations involving sole-source contracts.*

32. Around May 2021, Moses learned that senior vice president of training Cristi Ford had violated mandatory procurement procedures by awarding to her friends and personal acquaintances multiple sole-source contracts valued at $250,000 or higher without satisfying the bidding process requirements. Ford also deliberately omitted key required documents from the file for each of those sole-source contracts.

33. Around June 2021, Moses reported Ford's procurement and government contracting violations to Udochi, explained why they were illegal, and asked him to open a formal investigation into the violations. Moses also recommended that NRC suspend the implicated contracts for the duration of the formal investigation.

34. Several times between June 2021 and July 2021, Moses requested a status update on the formal investigation from Udochi and Simmons.

35. But neither responded to his request.

36. NRC ignored Moses's recommendation and did nothing to address or correct Ford's illegal activity concerning the sole-source contracts.

### *Moses opposes the practice of illegally awarding multiyear contracts.*

37. Around June 2021, Moses discovered that Esmond, Simmons, and chief information officer Michael Huthwaite had begun the illegal practice of awarding multiyear contracts funded with annual federal appropriations to vendors.

38. Between June 2021 and November 2021, Moses told Esmond, Huthwaite, and Simmons several different times that awarding multiyear contracts funded with annual federal appropriations was illegal. Absent authorization from Congress, Moses explained, NRC can award only annual contracts because NRC receives federal appropriations only annually.

39. Each time Moses told Esmond, Huthwaite, and Simmons they were acting illegally, he warned that he would not cover for them if their illegal practice of awarding multiyear contracts without authorization were investigated.

40. Despite Moses's warnings, Esmond, Huthwaite, and Simmons continued their illegal practice of awarding multiyear contracts to vendors.

41. That made Moses tell Simmons in approximately September 2021 to ask Congress to confirm whether the practice of awarding multiyear contracts to vendors without authorization was legal.

42. Simmons responded, "*No! I don't want them in our business.*"

**Moses reports the illegal raising of NRC's threshold for simplified procurement actions.**

43. Around July 2021, Esmond told Moses she wanted to raise NRC's threshold for simplified procurement actions from $20,000 to a range of $50,000-$100,000.

44. Esmond proposed this change because she wanted to circumvent the requirements for processing federal procurement contracts valued above $20,000.

45. Moses opposed Esmond's proposal because he knew it was illegal. He told Esmond that NRC was already at risk for noncompliance because of the $20,000 threshold and that it was necessary given NRC's size and annual budget.

46. Still, around late August 2021, Moses learned from some of his subordinates that Rodriguez, Huthwaite, Esmond, Ford, and senior vice president of leadership Brooke Finn were pressuring them to raise the $20,000 threshold.

47. Moses reported the problem to Udochi immediately. He told Udochi that Rodriguez, Huthwaite, Esmond, Ford, and Finn were pressuring his subordinates to raise the $20,000 threshold for simplified procurement actions and explained why that was illegal. He also recommended that Udochi open a formal investigation into the problem.

48. In October 2021, Udochi announced to Rodriguez, Huthwaite, Ifill, Esmond,

Simmons, and several other NRC higher-ups that he planned to audit all procurement actions for all contracts valued at $20,000 or lower for possible procurement violations.

49. Three days after that announcement, Esmond told Moses the announcement made Rodriguez, Huthwaite, and many other NRC higher-ups upset. Esmond reprimanded Moses for reporting the illegal activity to Udochi without forewarning her about his plan to report it. She also admitted to experiencing "*great anxiety*" because she knew the audit would expose multiple procurement and government contracting violations.

### *Moses reports the misuse of HUD grant funds.*

50. Around January 2022, Moses learned from a subordinate that Ford was using grant funds from the Department of Housing and Urban Develop (HUD) to fund nonrelated projects.

51. Because Moses knew Ford's misuse of HUD grant funds was illegal, he reported the violation to Udochi that same month, explained why it was illegal, and requested a formal investigation into it.

### *Moses participates in NRC's formal investigation into the reported violations.*

52. On January 17, 2022, an internal audit team led by Meruvia interviewed Moses because of his numerous requests for formal investigations into the numerous procurement and government contracting violations occurring at NRC. Meruvia conducted the interview by Zoom. At the start Moses asked for the Zoom call to be recorded. But Meruvia refused. During the interview Moses identified the procurement and government contracting violations he knew about: the illegal extending and illegal funding of the HPN contract; the illegal practice of noncompetitively awarding sole-source contracts to friends and personal acquaintances; the illegal practice of awarding multiyear contracts without authorization; the illegal practice of raising the threshold for simplified procurement actions above $20,000; and the illegal practice of using HUD grants to fund nonrelated matters. He identified Rodriguez, Simmons, Ford,

Esmond, Huthwaite, Ifill, and Finn as the higher-ups engaging in the violations. He explained exactly why the violations were illegal. He told the team about reports of similar violations he had received from his subordinates. And he spotlighted issues for the team to target during its investigation.

53.    Rodriguez, Simmons, Esmond, Ford, Huthwaite, Ifill, and Finn received a detailed account of the interview right afterward.

### *NRC punishes Moses by firing him.*

54.    Three days later, on January 20, 2022, NRC summarily fired Moses.

55.    Rodriguez, Simmons, Esmond, Ford, Huthwaite, Ifill, and Finn were involved in the firing decision.

56.    The reasons NRC gave for firing Moses are false and pretextual. NRC expressly promises in its Administrative Manual to "utilize progressive discipline" and to ensure that employees who internally report "illegal practices or violations of adopted policies of the organization . . . will be protected from reprisals or victimization for whistle-blowing in good faith." But NRC did not warn Moses verbally or in writing about any legitimate performance issue before firing him. Nor did NRC ever take any previous disciplinary action against him. Because Moses performed his job duties in an exemplary manner and met all legitimate job expectations during his tenure at NRC, his opposition to the procurement and government contracting violations and his internal reporting about the violations constituted the only reason that actual and legitimate tension existed between him and NRC. This means NRC fired Moses in retaliation for his efforts to stop NRC's illegal activity, his efforts to bring NRC into compliance with the applicable laws identified above, his numerous reports to NRC's internal audit department, and his participation in the department team's formal investigation. It also means NRC breached the express promises that constituted the terms and conditions of his employment.

57. Moses reasonably and in good faith believed that the acts and omissions described above violated the terms of NRC's federal grants and all related laws. The actions he undertook to stop these violations were subjectively and objectively reasonable.

58. The procurement and government contracting violations described above were observed not only by Moses but also by many other former and current NRC employees who are willing to come forward.

59. Moses has suffered significant economic and noneconomic harm as a direct, actual, and proximate result of NRC's decision to fire him. His rising career at NRC has been destroyed. He has suffered and continues to suffer significant loss of pay and benefits. He has experienced and continues to experience humiliation, emotional distress, depression, mental anguish, health issues, and the loss of a quality life and enjoyment of life. His professional reputation has been significantly harmed. To date, he is still seeking employment.

## Claims for Relief

### COUNT 1: RETALIATION
(Violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*)

60. Moses incorporates every preceding paragraph as alleged above.

61. The FCA forbids a person *from* knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the federal government; *from* knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; *from* possessing or controlling property or money used, or to be used, by the federal government and knowingly delivering, or causing to be delivered, less than all of that money or property; *from* making or delivering—with the intent to defraud the federal government—a document certifying receipt of property used, or to be used, by the federal government without completely knowing that the information on the receipt is true; *from* knowingly buying, or receiving as a pledge of an obligation or debt, public property from an officer or employee of the federal government, or a member of the Armed Forces, who is

10

forbidden from selling or pledging property; *from* knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the federal government; *from* knowingly concealing, or knowingly and improperly avoiding or decreasing, an obligation to pay or transmit money or property to the federal government; or *from* conspiring to commit any of the aforementioned violations.

62. The FCA also forbids retaliation, which happens when an employer discriminates against an employee for engaging in protected activity. Examples of activity protected under the FCA include acting in furtherance of an FCA suit and making other efforts to stop FCA violations. Examples of discrimination under the FCA include, without limitation, firing, suspending, threatening, and harassing an employee.

63. Moses reasonably and in good faith believed NRC violated the FCA when it committed the procurement and government contracting violations described in this Complaint.

64. Moses engaged in FCA-protected activity because, among other things, he opposed the procurement and government contraction violations he discovered, reported the violations, and participated in a formal investigation into the violations.

65. NRC had actual knowledge of Moses's protected activity when it took the discriminatory actions described in this Complaint against him.

66. NRC violated the FCA because it retaliated against Moses by, among other things, firing him on account of his protected activity.

67. As a direct, actual, and proximate result of NRC's illegal conduct, Moses has suffered economic and noneconomic damages, including loss of future pay and benefits, loss of back pay and benefits, loss of promotion opportunities, mental anguish, health issues, anxiety, frustration, pain, humiliation, loss of reputation, and loss of quality and enjoyment of life.

68. NRC's actions were wanton, reckless, or in willful indifference to Moses's legal rights.

### COUNT 2: WRONGFUL DISCHARGE
### (Violation of DC Common Law)

69. Moses incorporates every preceding paragraph as alleged above.

70. Moses refused to ignore the multiple procurement and government contracting violations he discovered. Among other things, he opposed the violations, reported the violations, and participated in a formal investigation into the violations.

71. NRC had actual knowledge of Moses's opposition to and internal reporting of the violations when it fired him.

72. NRC wrongfully discharged Moses by firing him in retaliation for engaging in the conduct described above.

73. As a direct, actual, and proximate result of NRC's illegal misconduct, Moses has suffered economic and noneconomic damages, including loss of future pay and benefits, loss of back pay and benefits, loss of promotion opportunities, mental anguish, health issues, anxiety, frustration, pain, humiliation, loss of reputation, and loss of quality and enjoyment of life.

74. NRC's actions were wanton, reckless, or in willful indifference to Moses's legal rights.

### COUNT 3: PROMISSORY ESTOPPEL
### (Violation of DC Common Law)

75. Moses incorporates every preceding paragraph as alleged above.

76. NRC expressly promised Moses that he would be subject to progressive discipline if the need for disciplinary action arose.

77. NRC expressly promised Moses that he would not suffer retaliation for opposing or reporting illegal activity or violations of its adopted policies.

78. Moses relied on those promises to his detriment. He did not secure other employment before opposing the procurement and government contracting violations he discovered, reporting the violations, and participating in a formal investigation into the violations. Had he known NRC would renege on its promises, he would have secured other

12

employment before making multiple efforts to stop the violations.

79. NRC committed promissory estoppel by summarily firing Moses for opposing and reporting those violations despite its promises to the contrary.

80. As a result of NRC's illegal misconduct, Moses has suffered economic and noneconomic damages, including loss of future pay and benefits, loss of back pay and benefits, loss of promotion opportunities, mental anguish, health issues, anxiety, frustration, pain, humiliation, loss of reputation, and loss of quality and enjoyment of life.

81. NRC's actions were wanton, reckless, or in willful indifference to Moses's legal rights.

## Request for Relief

82. Moses requests that this Court:

    a. Declare that NRC's mistreatment of Moses violated the FCA and DC common law;

    b. Order NRC to restore Moses to his former position or to a comparable position and award him other appropriate equitable relief;

    c. Order NRC to establish programs, practices and policies that eliminate the effects of past discrimination and retaliation in violation of the FCA and DC common law;

    d. Order NRC to pay Moses nominal damages;

    e. Order NRC to make Moses whole with payment of all economic losses suffered as a result of the events described above, including awards of back pay, reinstatement or front pay, lost benefits including lost health and retirement benefits, all with prejudgment and postjudgment interest as applicable;

    f. Order NRC to pay Moses a separate and additional sum equivalent to his award of back pay, as required under the FCA;

    g. Order NRC to make Moses whole by providing him full compensation for all noneconomic damages, including emotional pain, suffering, inconvenience, anxiety,

frustration, mental anguish, health issues, loss of reputation, and loss of quality and enjoyment of life, with prejudgment and postjudgment interest as applicable;

      h.      Order NRC to pay Moses punitive damages;

      i.      Order NRC to pay Moses attorney's fees, expenses, and costs; and

      j.      Order all other appropriate relief.

Respectfully submitted,

| | |
|---|---|
| Onyebuchim A. Chinwah<br>(Pro Hac Vice Admission forthcoming)<br>THE CHINWAH FIRM LLC<br>8403 Colesville Road, Suite 1100<br>Silver Spring, MD 20910<br>Phone: (240) 842-9292<br>Email: oc@chinwahfirm.com<br>*Lead Counsel for Plaintiff* | /s/ Darrell Chambers<br>Darrell Chambers<br>(DC Bar # 980872)<br>The CHAMBERS FIRM LLC<br>116 Village Boulevard, Suite 200<br>Princeton, NJ 08540<br>Phone: (410) 660-3692<br>Email: darrell@chambersfirmDCMD.com<br>*Cocounsel for Plaintiff* |